STATE OF HAWAII, Plaintiff-Appellee, *v.* DONALD LESTER and KENNETH A. GAUT, Defendants-Appellants, and JAMES VINCENT MORI, ELIZABETH Y. TUTTLE, KENNETH E. ANDERSON, PATRICK J. HILDEBRAND, RONNIE G. WILSON and PATRICK L. HAMLOW, Defendants

NO. 7313

(CRIMINAL NO. 51930)

JUNE 22, 1982

RICHARDSON, C.J., LUM, NAKAMURA, JJ.,
AND RETIRED JUSTICES OGATA AND MENOR,
ASSIGNED TEMPORARILY

660

## OPINION OF THE COURT BY LUM, J.

This case involves the criminal trial and convictions of defendants-appellants Kenneth A. Gaut and Donald Lester. They were indicted along with others[1] for having committed the crime of the murder of Michelle Lester (by a hired killer)[2] under § 707-701[3]

---

[1] Also charged in the same indictment were James Vincent Mori, Elizabeth Y. Tuttle, Kenneth E. Anderson, Patrick J. Hildebrand, Ronnie G. Wilson and Patrick L. Hamlow, but they were allowed to plead to reduced charges under plea bargain agreements with the government.

[2] The pertinent counts charged Lester with having hired Gaut and the others to do the killing, and Gaut and the others of agreeing (to being hired) to do the killing.

[3] § 707-701 (1976) *Murder.* (1) Except as provided in section 707-702, a person commits the offense of murder if he intentionally or knowingly causes the death of another person.
(2) Murder is a class A felony for which the defendant shall be sentenced to imprisonment as provided in section 706-606.

and § 706-606(a)(iii),[4] Hawaii Revised Statutes (HRS). The jury found Gaut guilty of manslaughter, and Lester guilty as charged.

From their convictions they filed this joint appeal, raising numerous questions concerning the propriety of their convictions. We discuss herein these questions except those patently without merit. We affirm.

.I.

The event which uncovered the bizarre agreement to murder Michelle Lester, wife of defendant Lester, occurred in the early morning of August 27, 1978 with the discovery of her death by Honolulu police officer Kenneth Ikehara in a vehicle near the Wilson Tunnel. Present in the vehicle with her at that time were co-indictee Mori and defendant Gaut. The cause of her death was later determined to be strangulation.

In the trial of the two, conflicting versions were presented to the jury.

The government's case was based primarily upon the testimonies of co-indictees Tuttle, Anderson and Mori, all of whom were immunized from prosecution under § 621C-1 (1976),[5] HRS. Essentially, their testimonies described the circumstances which culminated in

---

[4] § 706-606 (1976) *Sentence for offense of murder.* The court shall sentence a person who has been convicted of murder to an indeterminate term of imprisonment. In such cases the court shall impose the maximum length of imprisonment as follows:
    (a) Life imprisonment without possibility of parole in the murder of:
    .   .   .   .

       (iii) A person by a hired killer, in which event both the person hired and the person responsible for hiring the killer shall be punished under this subsection. . . .

[5] [§ 621C-1] *Immunity generally.* (a) A witness who asserts his privilege against self-incrimination before a court or grand jury may be directed to testify or produce other information as provided in this chapter. He shall not thereafter be excused from testifying or producing other information on the ground that his testimony or other information required of him may tend to incriminate him, but he shall not be prosecuted or punished in any criminal action or proceeding for or on account of any act, transaction, matter, or thing concerning which he is so directed to testify or produce other information, except that he may be prosecuted for perjury or any other offense constituting a failure to comply with such direction.

an agreement between Lester and the other co-indictees to have Michelle killed for a price of $7,000 to be paid by Lester and the circumstances which followed their conceived plan, in which Michelle was invited by Tuttle to a party, and subsequently invited by Gaut and Mori for a car ride, during which time defendant Gaut struck and strangled her.

The government's case against Lester was strengthened by the introduction of a taped conversation between Lester and Tuttle in a public park. At the behest of the police, Tuttle had earlier agreed to arrange a meeting with Lester and to tape their conversation on a tape recorder strapped to her person. The conversation revealed incriminatory statements by Lester concerning the agreement.

In his behalf, Gaut admits to the discussion and planning of Michelle's death, except he claims he was playing along and was just "B.S.'ing." He admits to striking Michelle, but he points to Mori as the culprit who strangled Michelle.

Lester denied making a serious offer to have his wife killed; he denied having hired anyone to kill his wife.

## II.

Lester claims that the warrantless recordation of his conversation with Tuttle violates the fourth amendment of the U.S. Constitution,[6] article I, sections 6[7] and 7[8] of the Hawaii State Constitution and HRS chapter 803, part IV (Supp. 1981) ("Electronic Eavesdropping"),

---

[6] U.S. Const. amend. IV. *The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated,* and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized. (Emphasis added.)

[7] Haw. Const. art. I, § 6. *The right of the people to privacy* is recognized and shall *not be infringed without the showing of a compelling state interest.* . . . (Emphasis added.)

[8] Haw. Const. art. I, § 7 (formerly § 5). The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches, seizures and *invasions of privacy shall not be violated;* and *no warrants shall issue but upon probable cause,* supported by oath or affirmation, *and particularly describing* the place to be searched and the persons or things to be seized or *the communications sought to be intercepted.* (Emphasis added.)

and that it was error for the court not to have granted his motion to suppress the conversation.

Legal analysis to Lester's contentions must necessarily begin with a determination of how his verbal statements were obtained by the government. Lester's incriminatory statements were made face to face with a government agent[9] (Tuttle) in a public park. Tuttle willingly taped to her body a recording device and consented to have the conversation recorded. Lester, on the other hand, was not aware of the hidden device and certainly did not consent to have the conversation taped. The tape was willingly produced by Tuttle during the trial.

As can be seen, one of the parties was a willing participant and consented to the eavesdrop.[10] Consensual eavesdropping or participant monitoring, see Greenwalt, *The Consent Problem in Wiretapping and Eavesdropping: Surreptitious Monitoring with the Consent of a Participant in a Conversation,* 68 Colum. L. Rev. 189 (1968), is commonly used by law enforcement officials in securing incriminatory statements against a suspect. See A. Westin, *Privacy & Freedom* (1967) and Enker, *Controls on Electronic Eavesdropping – a Basic Distinction,* 2 Israel L. Rev. 461 (1967). The overwhelming weight of authority have upheld these warrantless consensual or participant eavesdrops. *See* Annot. 97 ALR2d 1283, section 10 (1964).

Even in federal proceedings, under the federal wiretap statute,[11] court approval is not required to effectuate this type of interception, 18 USC § 2511(2)(c), *On Lee v. United States,* 343 U.S. 747, 753-54 (1952), although such interception may be illegal by statute in state proceedings. *See Commonwealth v. McCoy,* 442 Pa. 234, 275 A.2d 28 (1971).

The American Bar Association recommends that the use of electronic techniques by law enforcement officers for the overhearing or recording of wire or oral communications with the con-

---

[9] The State stipulated that Tuttle was acting as a government agent.

[10] Certainly there are other types of eavesdrops in which none of the parties to the conversation has consented, but these types of eavesdrops are beyond this discussion.

[11] Title III of the Omnibus Crime Control & Safe Streets Act of 1968, Pub. L. 90-351, 82 Stat. 197.

sent of one of the parties be permitted. § 4.1, ABA Standards Relating to Electronic Surveillance, Approved Draft, 1971.

### A.

Participant or consensual monitoring has withstood constitutional scrutiny by the U.S. Supreme Court on the basis that no eavesdropping is involved since the government agent is free to testify to what was heard and the tape merely preserves his credibility, as evidenced by the following pertinent statements:

> Indeed this case involves no "eavesdropping" whatever in any proper sense of that term. The Government did not use an electronic device to listen in on conversations it could not otherwise have heard. Instead, the device was used only to obtain the most reliable evidence possible of a conversation in which the Government's own agent was a participant and which that agent was fully entitled to disclose. And the device was not planted by means of an unlawful physical invasion of petitioner's premises under circumstances which would violate the Fourth Amendment. It was carried in and out by an agent who was there with petitioner's assent, and it neither saw nor heard more than the agent himself.

*Lopez v. United States,* 373 U.S. 427, 439 (1963).[12]

> Concededly a police agent who conceals his police connections may write down for official use his conversations with a defendant and testify concerning them, without a warrant authorizing his encounters with the defendant and without otherwise violating the latter's Fourth Amendment rights. *Hoffa v. United States,* 385 U.S., [293] at 300-303. For constitutional purposes, no different result is required if the agent instead of immediately reporting and transcribing his conversations with the defendant, either (1) simultaneously records them with electronic equipment which he is carrying on his person, *Lopez v. United States, supra;* (2) or carries radio equipment which simultaneously transmits the conversations either to recording

---

[12] During a visit to the defendant's office, the government agent recorded the conversation on a recording device carried in the agent's pocket.

equipment located elsewhere or to other agents monitoring the transmitting frequency. *On Lee v. United States, supra.* If the conduct and revelations of an agent operating without electronic equipment do not invade the defendant's constitutionally justifiable expectations of privacy; neither does a simultaneous recording of the same conversations made by the agent or by others from transmissions received from the agent to whom the defendant is talking and whose trustworthiness the defendant necessarily risks.

*United States v. White,* 401 U.S. 745, 751 (1971),[13] Justice White for the plurality.

Nor does the Constitution protect the privacy of individuals in respondent's position. In *Lopez v. United States,* 373 U.S. 427, 439, we held that the Fourth Amendment provided no protection to an individual against the recording of his statements by the IRS agent to whom he was speaking. In doing so, we repudiated any suggestion that the defendant had a "constitutional right to rely on possible flaws in the agent's memory, or to challenge the agent's credibility without being beset by corroborating evidence that is not susceptible of impeachment," concluding instead that "the risk that petitioner took in offering a bribe to [the IRS agent] fairly included the risk that the offer would be accurately reproduced in court, whether by faultless memory or mechanical recording." The same analysis was applied in *United States v. White,* 401 U.S. 745, to consensual monitoring and recording by means of a transmitter concealed on an informant's person, even though the defendant did not know that he was speaking with a Government agent. . . .

Justice Stevens in *United States v. Caceres,* 440 U.S. 741, 750 (1979).[14]

We reject Lester's claim on this issue, and we see no compelling reason to afford greater minimum protection to the instance at hand. *State v. Santiago,* 53 Haw. 254, 265, 492 P.2d 657, 664 (1971).

---

[13] Government agent overheard a conversation between defendant and an informant by monitoring transmissions from a radio transmitter concealed upon the person of the informant.

[14] Government agent taped a bribery offer made by defendant in the office of the agent.

## B.

Lester urges that under the invasion-of-privacy protection under article I, section 7 of the Hawaii Constitution, all electronic eavesdropping must be by warrant, supported by probable cause, with a description of the communication sought to be intercepted, citing Stand. Comm. Rep. No. 55, 2d Hawaii Constitutional Convention, *reprinted in* I Proceedings of the Constitutional Convention of Hawaii of 1968, at 232 (1968); *State v. Roy,* 54 Haw. 513, 510 P.2d 1066 (1973); *State v. Stachler,* 58 Haw. 412, 570 P.2d 1323 (1977).

The pertinent language of the aforementioned report is hardly supportive of his claim for its states:

Several proposals sought to secure all persons against unreasonable interceptions of their communications or other invasions of their privacy. Your Committee recognizes the *need for certain protections of the individual's right to privacy* in the context of today's society. The tremendous growth of the electronic communications technology along with a corresponding growth of *electronic surveillance techniques* make possible the ready encroachment upon a person's private conduct and communication. The recently enacted Hawaii statute prohibiting wiretapping and eavesdropping by private persons as well as law enforcement officials protects the individual's communications from interception, and your Committee recognizes that the legislature took proper initiative to legislate protection in that area under our existing constitutional provision. . . . *Your Committee believes that a specific protection against communications interception in the Constitution may be somewhat narrow and limiting and therefore recommends a broader protection in terms of right of privacy.* . . .

Your Committee is of the opinion that *inclusion of the term "invasions of privacy" will effectively protect the individual's wishes for privacy as a legitimate social interest. The proposed amendment is intended to include protection against indiscriminate wiretapping as well as undue government inquiry into and regulation of those areas of a person's life which are defined as necessary to insure "man's individuality and human dignity."*

I Proceedings of the Constitutional Convention of Hawaii of 1968, at 233-34 (emphasis added).

We note first of all that the inclusion of the term "invasion of privacy" to the 1968 amendment was intended to protect against *indiscriminate wiretapping* (emphasis added) by the government as well as undue government inquiry into those areas of a person's life which are defined as necessary to insure man's individuality and human dignity.

Our inquiry must also focus upon whether participant monitoring is an invasion of privacy under Hawaii's constitution.

Appellant Lester cites *People v. Beavers,* 393 Mich. 554, 227 N.W.2d 511 (1975), *cert. denied,* 423 U.S. 878 (1975); *State v. Brackman,* 178 Mont. 105, 582 P.2d 1216 (1978); *State v. Glass,* 583 P.2d 872 (Alas. 1978). These state courts have interpreted their right-to-privacy provisions in their constitutions as imposing a warrant requirement.[15]

While these cases are instructive, we are not persuaded that the rationale and conclusion reached by those courts are controlling. State constitutions must be construed with due regard to the intent of the framers of the constitutions. *State v. Miyasaki,* 62 Haw. 269, 281, 614 P.2d 915, 922 (1980).

The right-to-privacy provision of article I, section 6 relates to privacy in the informational and personal autonomy sense, encompassing the common law right to privacy or tort privacy, and the ability of a person to control the provacy of information about himself, such as unauthorized public disclosure of embarrassing or personal facts about himself. Stand. Comm. Rep. No. 69, 1 Proceedings of the Constitutional Convention of Hawaii 1978, at 674-76 (1978). It concerns the possible abuses in the use of highly personal and intimate information in the hands of government or private parties. Comm. of the Whole Rep. No. 15, I Proceedings of the Constitutional Convention of 1978, at 1024 (1978).

Whereas article I, section 7 is limited to criminal cases, Stand. Comm. Rep. No. 69, *supra;* it is to be construed in light of the language of *Katz v. United States,* 389 U.S. 347 (1967), regarding reasonable expectation of privacy, in which privacy is to be used not in the sense of a fundamental right, but as a test of whether the

---

[15] We also note that State v. Reeves, 31 Cr. L. Rep. 2001 (La. Mar. 1, 1982), reached the same conclusion.

prohibition against unreasonable searches and seizures applies. Comm. of the Whole Report No. 15, *supra* at 2024.

Given this obvious distinction, we conclude that Lester's taped conversation is without reasonable expectation of privacy (see Part A) and is not protected conversation under Hawaii's constitution.

### C.

Neither do we find merit to Lester's argument that the use of the recording device by the government constituted "bugging," in violation of Hawaii's Wiretap Law, HRS §§ 803-41 to 803-50. While "bugging" is defined as the interception of oral communication by concealed microphones, §§ 803-41(2) and 803-42, we find that the "bugging" ban is inappropriate to participant monitoring for the Act explicitly provides under § 803-42(b)(3):

It shall not be unlawful under this part for a person to intercept a wire or oral communication *where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception.* . . . (Emphasis added.)

As noted earlier, federal courts have likewise interpreted the federal law, the counterpart to Hawaii's Wiretap Law, as authorizing the use of taped conversation as a result of consensual or participant monitoring. *United States v. Rich,* 518 F.2d 980 (8th Cir. 1975), *cert. denied,* 427 U.S. 907 (1976); *United States v. Hodge,* 539 F.2d 898 (6th Cir. 1976), *cert. denied sub. nom. Robertson v. United States,* 429 U.S. 1091 (1977).

Consequently, we find no violation of Hawaii's Wiretap Law.

### III.

Lester makes obtuse assertions that evidence introduced against Gaut was used against him by the jury, that Gaut's objections during trial reflected adversely against him, and their defenses were antagonistic; hence it was error for the trial court to deny his motion for severance.

The matter of granting separate trials to criminal defendants jointly indicted rests within the sound discretion of the trial judge. *State v. Hashimoto,* 47 Haw. 185, 190, 389 P.2d 146, 150 (1963).

Lester fails in his burden of demonstrating prejudicial or unfair trial, and thus a showing of abuse of discretion by the trial judge. We find no reversible error here. *State v. Hashimoto, supra; United States v. Brooks,* 567 F.2d 134, 139 (D.C. Cir. 1977).

## IV.

Lester asserts that it was error for the trial court to refuse his request for a manslaughter instruction. The record fails to support a clear and precise request for a manslaughter instruction by Lester. Instead, the record merely shows that he requested the court to instruct the jury that in the event the jury should find Gaut guilty of manslaughter, the jury must acquit Lester of murder. Hence, no assignment of error can be ascribed to the court's failure to give a manslaughter instruction. Rule 30(e), Hawaii Rules of Penal Procedure. Furthermore, Lester denied hiring anyone to do the killing; consequently, even if the objection was properly preserved, we conclude from the record that there was no evidence from which the jury could have concluded that Lester was guilty of manslaughter. *State v. Santiago, supra.*

## V.

Lester assigns error to the following instructions:
State's Instruction No. 2:
Defendant Donald Lester is charged with the offense of Murder by a Hired Killer. A person commits the offense of Murder by a Hired Killer if he intentionally or knowingly causes the death of another person and he is the person hired to kill or the person responsible for the hiring.

In order to convict Donald Lester of this crime, the State must prove each element of the crime charged beyond a reasonable doubt. The elements are:

1. That Donald Lester;

2. Did hire another person or persons to kill Michelle Lester; and

3. That the person or persons hired to kill Michelle Lester did intentionally or knowingly cause the death of Michelle Lester.

Court's Instruction No. 12:

The words "to hire to kill" mean to engage the services of a person or persons to kill for remuneration.

Lester argues that these instructions are misleading, contradictory and explicitly erroneous for the reasons that the legislature did not enact an offense "murder by a hired killer."

We agree that there is no criminal offense of murder for hire. *State v. Lincoln*, 3 Haw. App. 107, 643 P.2d 807 (1982).

Lester was charged with murder. The phrase "by a hired killer" was not essential to the charge nor was it an element of the offense, but its inclusion can hardly be said to be fatal.

In addition, since murder by hiring is punishable by life imprisonment without parole, and ordinary murder without the hiring aspect allows parole, it is essential under due process that the jury determine that the killing was done by hire. Whether the factor of hiring is established through the instructions or through a special verdict form is immaterial. *State v. Apao*, 59 Haw. 625, 586 P.2d 250 (1978).

## VI.

On three separate oocasions, the jury requested clarification of "murder for hire," "murder" and "manslaughter," and thereafter upon the jury's request, the written instructions were given to them over objections.

The submission of written instructions to the jury is a matter within the discretion of the trial court. *McDaniel v. United States*, 343 F.2d 785, 789 (5th Cir. 1965), *cert. denied*, 382 U.S. 826 (1965).

We find no abuse of discretion by the trial court. Lester's added claim that the court's acquiescence in giving the instructions to the jury highlighted and unduly emphasized the hiring aspect of the case is highly speculative and conjectural.

## VII.

Lester contends that the prosecutor had failed to prove beyond a reasonable doubt the required element of causation. Essentially, he claims that there was no proof that the hired killer or killers inten-

tionally or knowingly caused Michelle's death since the jury found Gaut guilty of manslaughter and Mori was allowed to plead guilty to manslaughter.

We are not persuaded by this argument. Lester's argument requires a single interpretation of the jury's verdict. The jury is free to make all reasonable and rational inferences under the facts, and the jury's finding will not be disturbed upon review unless clearly erroneous. Mori's plea to manslaughter did not preclude the jury from rationally concluding that Mori intentionally or knowingly did the killing.

In fact, Gaut's version at trial that Mori did the killing supports the jury's verdict. There was sufficient evidence to support the jury's verdict, *State v. Rocker,* 52 Haw. 336, 475 P.2d 684, 691 (1970), and we conclude that the two verdicts in the circumstances hereof were not inconsistent.

## VIII.

Gaut asserts that the trial court erred in denying his motion for a bifurcated trial. He wanted a two-stage trial, the first to consider his criminal liability for murder, and the second to establish that the murder was done by a hired killer. He contends that without a bifurcated trial to consider the issues separately, he would be denied a fair trial because the jury would use his culpability in the murder to convict him of being a hired killer.

There is no constitutional right to a bifurcated trial, *Spencer v. Texas,* 385 U.S. 554, 568 (1967), and the decision to grant bifurcation rests within the sound discretion of the trial court. *United States v. Bennett,* 460 F.2d 872, 880-81 (D.C. Cir. 1972); *Harried v. United States,* 389 F.2d 281, 284 (D.C. Cir. 1967).

We see none of the prejudice asserted herein by Gaut since he was convicted of manslaughter, and we find no abuse of discretion by the trial judge.

## IX.

Both Lester and Gaut challenge the grant of immunity under HRS § 621C-3 and plea bargains given to the co-indictees who testified on behalf of the State. They claim that because the grants

were given conditionally, that is, the co-indictees were required to testify truthfully and were not to receive the benefits of the agreements until after their testimonies, appellants were denied constitutional due process of a fair trial. Gaut even argues that in fairness, transactional immunity under § 621C-4 should have been given.[16]

We reject appellant's argument that the expectation of leniency of the co-indictees in return for their truthful testimonies denied appellant a fair trial or due process of law. Such expectations went merely to the credibility, not admissibility, of the co-indictees' statements, and the issue of credibility is for the jury. We see no reason to disturb the findings of the jury. *State v. Wakinekona*, 53 Haw. 574, 577, 499 P.2d 678, 681 (1972); *State v. McGlynn*, 292 Minn. 405, 195 N.W.2d 583 (1972); *State v. DeWitt*, 286 N.W.2d 379 (Iowa 1979), *cert. denied*, 449 U.S. 844 (1980).

Affirmed.

*Herbert H. K. Lau* (*Marie Milks* and *Larry A. Goya* on the opening brief), Deputy Public Defenders, for defendant-appellant Kenneth A. Gaut.

*Stephen P. Pingree* and *Leslie S. Fukumoto* for defendant-appellant Donald Lester.

*Peter B. Carlisle*, Deputy Prosecuting Attorney, for plaintiff-appellee.

CONCURRING OPINION BY MENOR, J.

I concur in the results reached by the Court on the facts of this case. I, too, would affirm the defendants-appellants' convictions.

I also agree with the Court that the principles enunciated in *Katz v. United States*, 389 U.S. 347 (1967), must govern the disposition of the constitutional issue involving the surreptitious recording of defendant-appellant Lester's conversation with a government informer, by means of a tape recorder strapped to the informant's person. The Delegates to the 1978 Constitutional Convention made

---

[16] In State v. Miyasaki, *supra*, we declared use immunity under HRS § 621C-3 to be in violation of our constitution.

it clear that "[t]he privacy provision within Article I, Section 5 [now Article I, Section 7], should be construed in light of the language in *Katz v. United States,* 389 U.S. 347, 88 S. Ct. 507, 19 L. Ed.2d 576 (1967), regarding reasonable expectation of privacy." Comm. of the Whole Rep. No. 15, 3d Const. Conv., *reprinted in* I Proceedings of the Const. Conv. of Hawaii of 1978, at 1024 (1978). The language in *Katz* which this court has adopted as its guide in construing the search and seizure provisions of the Hawaii Constitution is that of Justice Harlan:

> My understanding of the rule that has emerged from prior decisions is that there is a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as "reasonable." Thus a man's home is, for most purposes, a place where he expects privacy, but objects, activities, or statements that he exposes to the "plain view" of outsiders are not "protected" because no intention to keep them to himself has been exhibited. On the other hand, conversations in the open would not be protected against being overheard, for the expectation of privacy under the circumstances would be unreasonable. [389 U.S. at 361, Harlan, J. concurring.]

Thus, this court has held that in determining the legitimacy of a defendant's claim of privacy, the test to be applied is (1) whether the defendant has exhibited an actual (subjective) expectation of privacy and (2) whether the expectation is one which society deems to be reasonable. *State v. Texeira,* 62 Haw. 45, 609 P.2d 131 (1980); *State v. Dias,* 62 Haw. 52, 609 P.2d 637 (1980).

Although the Fourth Amendment has been held to protect persons and not places, *Katz v. United States, supra,* the place where an activity is conducted is nevertheless one of the factors to be considered in determining whether an individual has exhibited an actual expectation of privacy and whether society considers such expectation to be reasonable. *Id.; State v. Kaaheena,* 59 Haw. 23, 575 P.2d 462 (1978). In this connection, this court has also said:

> Every individual has expectations of privacy with regard to his *person* wherever he may go, be it a public park or a private place; yet this is not so with regard to *places* where an individual happens to be. The place must be of such a character as to give rise reasonably to these expectations of privacy. [*State v. Dias,* 52 Haw.

100, 107, 470 P.2d 510, 514 (1970).] (emphasis in original).

All intrusions upon a person's privacy will not always rise to the level of a constitutional infringement. The point at which they become impermissible will oftentimes depend, in part, upon the conduct of the individual himself. Thus, where an individual chooses to engage in activity outside of his private premises, where the risk of its exposure to a curious passerby or a curious eavesdropper is more evident, it cannot seriously be argued that his subjective expectation of privacy as to that activity and the view society will take as to the reasonableness of his expectation must necessarily be the same as where he engages in the same activity inside his home.

In this case, the conversation between Lester and the government agent (Tuttle) was held in a public park, an area open to the public where the likelihood of being overheard, surreptitiously or otherwise, must be deemed to have been greater than in more private surroundings. The essence of the conversation obviously was not of the ordinary variety, but the record fails to reveal that it was conducted under circumstances from which it may be determined that the defendant had taken precautionary measures to insulate his statements from other potentially listening ears. In short, the defendant has not been shown to have exhibited that actual expectation of privacy that the first prong of the *Katz* test requires. Where a person engages in activity which he knowingly exposes, or which is likely to be exposed, to public view or hearing, he will not be deemed to have exhibited an actual expectation of privacy as to that particular activity. *State v. Texeira, supra; State v. Dias, supra.* Thus, I am not at all convinced that the search and seizure provisions of the Hawaii Constitution, as construed in accordance with the language of *Katz*, were intended to proscribe the consentless recording of conversation anywhere and under all circumstances. *See also State v. Brackman,* 178 Mont. 105, 117, 582 P.2d 1216, 1222 (1978) (Haswell, C.J. and Harrison, J. dissenting).

In the circumstances of this case, therefore, I join the Court in upholding the introduction of the tape recording at trial against the defendant. Had this been a situation, however, where there had been a simultaneous transmission of the conversation to other hidden and listening enforcement agents, I would have been constrained to find otherwise. For there is indeed a recognizable differ-

ence between a government agent using a recording device and other officers listening in and recording the conversation. *United States v. White*, 401 U.S. 745, 788, 792 (1971) (Harlan, J. dissenting). The distinction lies in the degree of the intrusion and the qualitative impact it has upon the privacy interests of the individual. "Recognition of this difference is, at the very least, necessary to preserve the openness which is at the core of our traditions and is secure only in a society that tolerates official invasion of privacy simply in circumscribed situations." *Id.* In the latter situation, an intercept warrant would be required.

I would also draw the line where the conversation takes place within the defendant's home, or other private surroundings. "A man's dwelling, generally, is a place where he expects privacy, and except as to conduct, objects, and statements which he knowingly exposes to public view, he will be deemed to have exhibited an actual expectation of privacy therein." *State v. Dias, supra,* 62 Haw. at 55, 609 P.2d at 640. And as Justice Harlan has also pointed out, "a man's home is, for most purposes, a place where he expects privacy." *Katz v. United States, supra,* 389 U.S. at 361. The same can also be said with respect to activity within a person's private office, in his closed automobile, or other private place. In any of the foregoing circumstances, an individual's subjective expectation of privacy is more readily inferable and it would be one which society would just as readily consider to be reasonable.

Concededly, an undercover government agent who is a party to the conversation may repeat what is said, *State v. Roy,* 54 Haw. 513, 510 P.2d 1066 (1973), and the defendant must be presumed to have run the risk of its repetition. But I am not convinced that *a fortiori* he is presumed to have also chosen to run the risk of having his statements memorialized by a sophisticated instrument of whose presence and existence within the privacy of his personal surroundings he knows nothing about. However the United States Supreme Court may view the Fourth Amendment to the Federal Constitution in this context, *see United States v. White, supra; United States v. Caceres,* 440 U.S. 741 (1979), I would respectfully suggest that under Article I, Section 7, of the Hawaii Constitution, the surreptitious recording or transmission of a defendant's conversation with an undercover government agent within the confines of his private surroundings is proscribed. *See also State v. Sarmiento,* 397 So.2d 643 (Fla. 1981). I

would find it unthinkable that simply because an individual has invited another into his home, or other private place, he must be held to expect that his visitor may be carrying concealed upon his or her person sophisticated instruments intended to record, transmit, or videotape all that transpires within those premises. Such an expectation has not yet become commonplace in our society. Nor should it be allowed to become so.

## DISSENTING OPINION OF NAKAMURA, J.
## WITH WHOM RICHARDSON, C.J., JOINS

In affirming the conviction of Defendant-appellant Donald Lester, the court holds that an electronically recorded conversation between Lester and a co-defendant, who unbeknownst to Lester was then acting as a government agent, was properly admitted as evidence. It approves the warrantless electronic surveillance on the ground that "Lester's taped conversation . . . [was] without reasonable expectation of privacy . . . and is not protected conversation under Hawaii's constitution." But the delegates to the Constitutional Convention of Hawaii of 1968, in my opinion, meant to shield individuals from such incursions into ostensibly private conversations, and I respectfully dissent.

## I.

The Fourth Amendment to the Constitution of the United States commands that:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Article I, § 5 of the fundamental law adopted by the people of the State of Hawaii in 1959 provided security against unreasonable searches and seizures in like terms. When the Constitutional Convention of Hawaii of 1968 reviewed these provisions, it found a need

for additional protection against undue governmental encroachment upon the private lives of persons. And the relevant section, now designated as Article I, § 7, was amended to read:

> The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches, seizures *and invasions of privacy* shall not be violated; and no warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized *or the communications sought to be intercepted.*

(Emphasis supplied). Construing the foregoing provisions "in light of the language of *Katz v. United States,* 389 U.S. 347 (1967), regarding reasonable expectation of privacy," the court arrives at a conclusion that the conversation in question was not subject to protection. Reading the amended language in the light of its history as recorded in the Proceedings of the Constitutional Convention of Hawaii of 1968, *Berger v. New York,* 388 U.S. 41 (1967), and *Katz,* I would conclude the conversation was within the ambit of protection extended by Article I, § 7 of the State Constitution.

### A.

In the court's view, what we are confronted with is an instance of "consensual eavesdropping or participant monitoring," which has been sanctioned by the Supreme Court in *On Lee v. United States,* 343 U.S. 747, 753-54 (1952); *Lopez v. United States,* 373 U.S. 427, 439 (1963); *United States v. White,* 401 U.S. 745, 751 (1971);[1] and *United States v. Caceres,* 440 U.S. 741, 750 (1979).[2] "*On Lee* and *Lopez* are of a vintage opposed to *Berger* and *Katz.* However they may be explained, they are products of the old common-law notions of trespass." *United States v. White, supra,* at 760-61 (Douglas, J., dissenting). But as the

---

[1] *White*'s precedential value here is diminished by the fact that it was issued after the crucial amendment to the State Constitution had been approved.

[2] *Caceres* involved the recording of an offer of a bribe to an agent of the Internal Revenue Service who was conducting an audit of the defendant's income tax returns. There was no basis for holding an invasion of privacy had occurred. The case actually involved an alleged failure of the IRS to follow regulations covering the monitoring of conversations between taxpayers and IRS agents.

court correctly observes, Article I, § 7 must be considered with *Katz* and the concept of privacy, as well as trespassory notions, in mind. For "the fundamental principle in construing a constitutional provision is to give effect to the intention of the framers and the people adopting it." *HGEA v. County of Maui*, 59 Haw. 65, 80-81, 576 P.2d 1029, 1039 (1978).

1.

The protections afforded by the search and seizure provisions of the State Constitution were expanded in 1968 to include "[t]he right . . . to be secure . . . against unreasonable . . . invasions of privacy." The proposal to broaden the scope of Article I, § 7 (then designated as § 5) was part of the recommendations for amendments to the Hawaii Bill of Rights offered by the 1968 Convention's Committee on Bill of Rights, Suffrage and Elections. Committee Proposal No. 11, in Proceedings of the Constitutional Convention of Hawaii of 1968 (hereafter Proceedings), Vol. I, 236. Its proposal was to amend Article I, § 5 to read:

> The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches, seizures, *and invasions of privacy,* shall not be violated; and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized.

*Id.* (Emphasis added). The rationale given for the proffered textual change was:

> Your Committee recognizes the need for certain protections of the individual's right to privacy in the context of today's society. The tremendous growth of electronic communications technology along with a corresponding growth of electronic surveillance techniques make possible the ready encroachment upon a person's private conduct and communication. The recently enacted Hawaii statute prohibiting wiretapping and eavesdropping by private persons as well as law enforcement officials protects the individual's communications from interception, and your Committee recognizes that the legislature took proper initiative to legislate protection in that area under our existing constitutional provision. Recent United States Supreme Court

decisions have also enlarged and delineated the individual's protection against wiretapping and eavesdropping. Your Committee believes that a specific protection against communications interception in the Constitution may be somewhat narrow and limiting and therefore recommends a broader protection in terms of right of privacy.

Stand. Comm. Rep. No. 55, in Proceedings, Vol. I, 233. And the purpose and intent of the suggested change was stated in these terms:

Your Committee is of the opinion that inclusion of the term "invasions of privacy" will effectively protect the individual's wishes for privacy as a legitimate social interest. The proposed amendment is intended to include protection against indiscriminate wiretapping as well as undue government inquiry into and regulation of those areas of a person's life which are defined as necessary to insure "man's individuality and human dignity."

*Id.* at 233-34.

Thus, the proposal was advanced to fulfill a recognized "need for certain [constitutional] protections of the individual's right to privacy in the context of today's society." *Id.* at 233. The Committee also acknowledged with approval a contemporaneous legislative effort to provide security in the area of concern by referring to the "recently enacted Hawaii statute prohibiting wiretapping and eavesdropping." *Id.* The reference was to Act 209, S.L.H. 1967, which on its face did not countenance wiretapping and eavesdropping, consensual or otherwise, even by law enforcement officers.[3]

---

[3] Section 2 of S.L.H. 1967, c. 209, read as follows:

Wiretapping and wire interception prohibited; penalty.    (a) Any person who within this State, whether acting under color of law or otherwise:

(1) willfully intercepts, or attempts to intercept, any wire communication without the consent of both the sender and the receiver of such communication; or

(2) willfully discloses or attempts to disclose, or uses or attempts to use, any information, knowing or having reason to know that such information was obtained in violation of paragraph (1) of this subsection, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

(b) It shall be unlawful under this section for an operator of a switchboard, or an officer, employee or agent of any communications common carrier or public utility whose facilities are used in this State in the transmission of wire communications, to intercept, disclose. or use that communication in any way in the course of

When the proposal was brought before the members of the Convention acting as a Committee of the Whole, Delegate Rhoda Lewis offered an amendment to add "or the communications sought to be intercepted" at the end of Article I, § 5. Proceedings, Vol. II, 5. The inclusion therein of security against unreasonable "invasions of privacy," in her opinion, rendered it necessary for the language covering the issuance of warrants to be broadened too.[4] Her sugges-

---

his employment except while engaged in an activity which is a necessary incident of the rendition of service, which shall include investigation of complaints of users of the service.

    (c) It shall not be unlawful under this section for an officer, employee, or agent of the Federal Communications Commission, in any way in the course of his employment and in discharge of the monitoring responsibilities exercised by the Commission in the enforcement of the Federal Communications Act, to intercept a wire communication while it is being transmitted by radio, or to disclose or use the information thereby obtained.

and § 3 of S.L.H. 1967, c. 209, read as follows:

    Eavesdropping; penalty. Any person who, in this State, whether acting under color of law or otherwise:

        (1) willfully uses or attempts to use any electronic, mechanical or other device for the purpose of eavesdropping, without the consent of the parties to the conversation; or

        (2) willfully discloses or attempts to disclose, or uses or attempts to use, any information, knowing or having reason to know that such information was obtained in violation of paragraph (1) of this section, shall be fined not more than $10,000, or imprisoned not more than five years, or both.

The provisions of S.L.H. 1967, c. 209, subsequently codified as HRS §§ 275-1 to -5, were repealed by S.L.H. 1972, c. 9, ch. 13, the Penal Code. The Code provision covering wiretapping and eavesdropping, HRS § 711-1111, permits "consensual eavesdropping".

[4] Delegate Lewis served with distinction as a member of this court from 1959 to 1967, and was certainly knowledgeable in the field of constitutional law. Her rationale for offering the amendment to add "or the communications sought to be intercepted" was stated as follows:

    Now those last words I think require some expansion in order to keep up with the addition made in the first part of the section. In the first part of the section, we're adding "invasion of privacy" with reference to wiretapping among other things. Now the question is, if the legislature provided for it, and I'm aware that it is not provided for now, would the constitutional language be broad enough so that a warrant might issue upon probable cause, upon observing all necessary safeguards to intercept a communication.

    I submit that the language, the archaic language, "describing the place to be searched," is not apt. The language "and the persons or things to be seized" is not apt. Therefore, we should, as was done by the Maryland convention, add the words "or the communications sought to be intercepted," merely indicating that

tion was accepted, but only after lengthy debate that provides a clear insight into "the intention of the framers." *HGEA v. County of Maui, supra,* 59 Haw. at 80-81, 576 P.2d at 1039.

The discussion was opened by a proponent of the amendment, Delegate Yoshio Hasegawa, then a high-ranking officer in the Honolulu Police Department. His reason for supporting the amendment offered by Delegate Lewis was:

> Our existing statute prohibits any form of wiretapping or eavesdropping on a telephone. This was specified by a member of the Attorney General's office at the committee hearing. We cannot even monitor a telephone call on the extension telephone. I feel this is a necessity for police investigational technique.

Proceedings, Vol. II, 5. Debate on the statute, the Committee proposal, and the Lewis amendment followed; opinions pro and con on both the proposal and the amendment were voiced. Noteworthy are the views expressed by two members of the Committee on Bill of Rights, Suffrage and Elections, Delegate Jack Mizuha and Delegate George Noguchi. For their statements and those of Delegates Lewis and Hasegawa unequivocally reiterate what the language of Article I, § 7 already tells us, that "invasions of privacy" in search of evidence are unreasonable unless they are judicially authorized or fall into well-defined exceptional situations. One such situation is, of course, where there is probable cause to believe a crime has been committed but time constraints make it impractical to seek court approval for the quest. The statements of Delegates Mizuha and Noguchi are reproduced in the margin.[5]

---

under a procedure prescribed by the legislature if it sees fit to do so and upon probable cause duly shown a warrant may issue in this area. The federal law specifically provides that if authorized by state statute, the principal prosecuting attorney of the state may obtain from a judge of competent jurisdiction an order authorizing interception of wire or communication. It's a paraphrase. Therefore, this would all be in conformity with the present state of the law.
Proceedings, Vol. II, 5.

[5] Like Delegate Lewis, Delegate Mizuha had just retired from this court after eight years of distinguished service. His statement reads:

At the present time, New York State has a law against wiretapping and electronic eavesdropping similar to the statute that was passed by our state legislature a few sessions ago. In the now famous case of *Burger v. New York,* [sic] the Supreme Court of the United States laid down the rules under which the police

■■■■■■■■■■■■■■ ■■■■■

■■■■■■■■■■■■■■

### 2.

Though Article I, § 7 expressly deems a warrantless interception of communications an unreasonable invasion of privacy, the court nonetheless concludes no infringement of a right occurred because the communications in question were not subject to constitutional protection. Lester, it finds, had no reasonable expectation of privacy while engaged in a conversation with his co-defendant. Viewing the interception in the light of the concerns and expectations of the framers of the language at issue, I would conclude Article I, § 7 was breached.

*Berger v. New York, supra,* was cited during the relevant convention debate as the case where "the Supreme Court . . . laid down the

---

department of any of the cities and counties of New York can secure warrants to eavesdrop or wiretap and they are a stringent set of rules. And that is the only guideline we have at the present time for securing warrants for wiretapping and eavesdropping. If this amendment passes, it's nothing new. At the present time, under our state statutes we have provisions laid down by law and if any of the police organizations desire to get warrants to secure evidence by wiretapping and eavesdropping, they must go to the courts. I'm a bit confused by Delegate Hasegawa's statement to the effect that they can't even get a warrant to do it or that they're absolutely prohibited. On that point I disagree.

This is a matter for the courts to decide as to what evidence the police must have before they can get a warrant·to tap a wire or to put in a device known as the "bug." And I believe there shouldn't be any objection at the present time because this merely elaborates the status of the law in this State by virtue of the statute passed by the legislature.

Proceedings, Vol. II, 6.

Delegate Noguchi was a member of the legislature when Act 209 was passed in 1967. He was one of the thirty-six legislators who served in that session and also served as·delegates to the 1968 Constitutional Convention. His statement reads:

I would just like to make a comment here that this particular amendment was discussed in the committee and although the chairman expressed his sentiments here on the floor that it might be all right, I'd like to point out that it was discussed in committee and the thing — one of the things I would like to point out is that we felt that this language was broad enough to cover the situation as even Delegate Hasegawa brought out. It states, "unreasonable searches and seizures and invasions of privacy." In other words, the invasions here must be unreasonable. And if and when the state legislature sees fit that the police may issue warrants to interrupt communications or to wiretap for certain reasons then that would come under the purview of reasonable. And as the present law here prevents the police from wiretapping, and as Delegate Dyer pointed out, this particular language would then permit the police to wiretap the citizenry of the State, with a warrant and I think we should leave this to our state legislature.

*Id.*

rules under which . . . warrants to eavesdrop or wiretap" could be secured. Proceedings, Vol. II, 6. The committee report accompanying the proposal for the expansion of protections also directed the Convention's attention to "[r]ecent United States Supreme Court decisions [that] have . . . enlarged and delineated the individual's protection against wiretapping and eavesdropping." Proceedings, Vol. I, 233. The decisions influencing the Committee on Bill of Rights, Suffrage and Elections unquestionably were *Berger* and *Katz*.

*Berger*, which was decided in 1967, served to bring "wiretapping and other electronic eavesdropping fully within the purview of the Fourth Amendment." 388 U.S. at 64 (Douglas, J., concurring). For the Court's holdings there were that a " 'conversation' was within the Fourth Amendment's protections, and . . . the use of electronic devices to capture it was a 'search' within the meaning of the Amendment." *Berger v. New York, supra,* 388 U.S. at 51. *Katz v. United States, supra,* "a watershed in fourth amendment jurisprudence,"[6] followed shortly thereafter.[7]

The petitioner there phrased the questions posed for decision in terms of whether the electronic eavesdropping had penetrated "a constitutionally protected area." *Katz v. United States, supra,* 389 U.S. at 349-50. His formulation of the issues was rejected, as "the correct solution of Fourth Amendment problems is not necessarily promoted by incantation of the phrase 'constitutionally protected area.' " *Id.* at 350. And the Court enunciated what has since been regarded as the polestar in determining the scope of protections bestowed by the Amendment:

> For the Fourth Amendment protects people, not places. What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection. . . . But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected.

*Id.* at 351-52 (citations omitted). The fact that the "bug" did not penetrate the wall of the telephone booth from which the intercepted calls were made was considered of no constitutional signi-

---

[6] Amsterdam, *Perspectives on the Fourth Amendment,* 58 Minn. L. Rev. 349, 382 (1974).

[7] *Berger* was decided on June 12, 1967. *Katz* was decided on December 18, 1967.

ficance, and the defendant's conviction was reversed.

That the authors of our privacy provisions contemplated the conferral of security more expansive than the specific protections covered by the Supreme Court's opinions is evident. The pertinent committee report acknowledged the salutary impact of *Berger* and *Katz* in the areas of wiretapping and eavesdropping; it declared a further belief "that a specific protection against communications interception . . . may be somewhat narrow and limiting." Stand. Comm. Rep. No. 55, *supra,* Proceedings, Vol. I, at 233. The framers thus recommended "a broader protection" to "effectively protect the individual's wishes for privacy as a legitimate social interest." *Id.* at 233-34. And the social interest they sought to promote included security against "undue government inquiry into . . . those areas of a person's life . . . necessary to insure 'man's individuality and human dignity.' " *Id.* at 234. Privacy, then, attained constitutional dimension in Hawaii in even a broader sense than that declared in *Katz.*[8]

What the Supreme Court so boldly proclaimed in *Katz,* however, has since been transmuted to a "reasonable expectation of privacy" formula, Amsterdam, *supra,* at 404, and it is this test that the court purports to have applied. Implicit in the denial of constitutional protection here is a belief that no one should reasonably expect that another party to a conversation will not repeat its content, a proposition I would not seriously question. But the interest Article I, § 7 seeks to further is not protection against the foibles of one's acquaintances or the dire possibility that they may be agents of the police. What the framers expressly provided was security for the individual against unreasonable invasions of privacy by the government, and the history of Article I, § 7 manifests that this covers security against "indiscriminate electronic surveillance." The history also indicates that "electronic eavesdropping" carried out without authorization, in a situation not judicially recognized as an exceptional one where a warrant for a search may be forgone, is unreasonable. Of course, we are not dealing with such exceptional circumstances.

The meeting between Lester and his co-defendant and the recording of their conversation were arranged under the aegis of

---

[8] In this case, however, it is not necessary for us to determine what the limits of the protected interest may be.

the police; there is every reason to conclude he was then suspected of involvement in the killing of his wife. It is axiomatic that "[t]he legitimate and substantial public interest in law enforcement may prevail over an individual's interest in privacy in given situations." *State v. Kealoha*, 62 Haw. 166, 178, 613 P.2d 645, 652 (1980). Both the Fourth Amendment and Article I, § 7 sanction "a temporary and limited incursion" into his privacy "[w]here his probable involvement in crime and a likelihood that incriminating evidence may be . . . [obtained through electronic surveillance can be] demonstrated to a judicial officer." *Id.* Yet the government ignored " 'the procedure of antecedent justification . . . that is central to the Fourth Amendment' [and Article I, § 7], a procedure that . . . [is] a constitutional precondition of the kind of electronic surveillance involved in this case." *Katz v. United States, supra,* 389 U.S. at 359 (footnote omitted).

I would reverse Donald Lester's conviction and remand his case for retrial. For "if the particular form of surveillance practiced by the police is permitted to go unregulated by constitutional restraints, the amount of privacy and freedom remaining to citizens would be diminished to a compass inconsistent with the aims of a free and open society." Amsterdam, *supra,* at 403. Such a consequence could not have been envisioned by the delegates to the Constitutional Convention of Hawaii of 1968 who intended that "[w]herever a man may be, he is entitled to know that he will remain free from unreasonable searches and seizures" and unreasonable invasions of privacy. *Katz v. United States, supra,* 389 U.S. at 359.